Filed 6/11/14  P. v. Ramos CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RUDY RAMOS,<br><br>    Defendant and Appellant. | D065270<br><br><br>(Super. Ct. No. FSB058748) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Kyle S. Brodie, Judge.  Affirmed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Rudy Ramos guilty of two counts of first degree murder (Pen. Code,[1] § 187, subd. (a), counts 1 & 2). The jury found true the allegations that Ramos personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm ((§ 12022.53, subd. (c)) and personally used a firearm (§ 12022.53, subd. (d)). The court sentenced Ramos to 100 years to life in state prison.

On appeal, Ramos contends the court 1) abused its discretion when it ruled to admit into evidence a letter he wrote his family shortly after he gave police what the court found was a coerced confession during an interview at the police station; 2) erred by instructing the jury with modified CALCRIM No. 1403 regarding the limited purpose of evidence of gang activity; and 3) abused its discretion in denying in part his motion based on *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) to examine for "all prior acts of dishonesty" the personnel records of the detective who interviewed Ramos at the police station.

As we explain, we disagree with Ramos's contentions and thus affirm his judgment of conviction.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Prosecution Case*

On an evening in October 2006, Francisco Avila—a North Side Colton gang member who went by the moniker "Cisco"—testified he was hanging out smoking marijuana and drinking beer with his "cousins," victims Robert Chavez, Jr. and Jesus Hale, in the front yard at a house in Colton where Avila lived with his grandfather. At some point during the evening, another of Avila's cousins, Crystal Moya, and a neighbor, Mario Ruiz, a North Side Colton gang member who went by the moniker "Chuco" joined them. According to Avila, Ruiz was a member of the "bloque," which was a clique from North Colton whose members had committed murders.

Avila testified Chavez and Hale were Verdugo Flats gang members, a rival gang of North Side Colton. Ruiz was armed that evening with a .38 special revolver that Avila had purchased about two weeks earlier for $150. Avila previously had given Ruiz the weapon because Ruiz did not have any money to buy a gun of his own. At some point later in the evening, Ramos, who lived across the street, came over and smoked marijuana and hung out with the group. Avila testified Ramos also was then an active member of the North Side Colton gang who went by the moniker "Boogie." As discussed *post*, Ramos denied he was then an active gang member.

---

[2]    We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to the contentions raised by Ramos are discussed *post*.

Initially, the group just hung out and it seemed everyone was "getting along." According to Avila, Ramos asked Hale and Chavez if they were "down for the block," and the two in response said, "We'll be down for [the] block." About 20 minutes later, as Avila was on his telephone making a drug sale, he saw Ruiz and Ramos talking near a neighbor's house. Avila went over to Ruiz and Ramos, but Ruiz told Avila he wanted to talk to Ramos alone, which Avila found odd because they were all part of the same gang. Ramos then left and went back to his house.

Avila testified that a short time later, Ramos returned carrying a 30-30 rifle partially concealed under his sweater. Ramos walked up to Avila, said, "Check this out" and pointed the rifle at Avila while they stood on the sidewalk. Although the barrel of the rifle was only about six inches from Avila's chest, Avila said he initially was not worried because he believed Ramos was "playing around." Chavez, who was standing shoulder-to-shoulder with Avila, told Ramos not to point the gun at his cousin and used his right hand to swipe the rifle away. Avila testified that Ramos in response shot Chavez twice in the torso at point-blank range, killing him. Ramos then turned the weapon on Hale, who was standing on the grass about 20 feet away. Hale spun around as he was fatally hit by gunfire from the rifle.

Avila testified he tackled Ramos. Ruiz, who was about 25 feet away, began shooting in the general direction of Avila and Ramos, but according to Avila, Ruiz purposely did not intend to hit anyone. Ramos got up, picked up the rifle he had dropped on the ground and began running down the street. Ruiz also ran away.

4

A short distance from the shooting, Ramos dropped the rifle over a chain-link fence into a neighbor's backyard. Police arrived and saw an individual, later identified as Ramos, run from one side of the street, near the fence, to the other side of the street and attempt to get into a minivan that had just arrived on the scene. Police repeatedly demanded the individual stop, but the individual ignored those commands. An officer in response drew his weapon and approached the minivan as the individual attempted to enter the vehicle through a sliding door. The officer again demanded the individual exit the vehicle and yelled at the driver to stop. A short time later, the individual exited the minivan and police arrested him.

Shortly after police took the individual into custody, they went to the location near the chain-link fence where they had first seen the individual and found a rifle. Police later determined that Ramos's mother was the driver of the minivan and his grandmother a passenger on the night they intercepted it.

B. *Defense Case*

Ramos testified in his own defense. He admitted to shooting Chavez and Hale, but contended he did so in self-defense. As noted, Ramos denied being an active member of the North Side Colton gang at the time of the shooting, although he admitted at the time he sometimes hung out with gang members and went by the names "Boogie" and "Yeska" (the latter a reference to marijuana). Following his arrest and incarceration, Ramos testified he became a full-fledged North Side Colton gang member.

5

Ramos testified on the day of the shooting he slept for a good portion of the day after working the late shift the night before. After waking up, he smoked marijuana alone and then sometime after dark went across the street, where he met Avila, Chavez, Hale and a girl (ostensibly Moya). Ramos testified he did not know Chavez or Hale. However, he knew Avila. Ramos smoked marijuana and drank beer with the group. He felt "good" at the time and "pretty high."

According to Ramos, while they were hanging out Avila bragged about his recent purchase of a gun. Ramos in response went home and grabbed his fully-loaded 30-30 rifle that he also had recently purchased. He stated that he purposely avoided his mother and grandmother while at the house. He then took the rifle and went back across the street to meet the group. Ramos approached Avila while Avila was talking on the telephone and pointed the rifle at Avila. Ramos testified his intent then was to "poke [Avila]" with the rifle "to show him, like surprise, look what I go[t] too."

Ramos testified Chavez got angry when Ramos pointed the gun at Avila. Chavez grabbed the barrel of the rifle and told Ramos, "Watch what the fuck [you're] doing"; "[I] don't appreciate that shit" and Ramos "should try to ask someone from the 'V.' " Ramos testified that he understood Chavez's reference to the " 'V' " to mean the Verdugo Flats gang and that this statement was "not a good thing to hear." Ramos knew Chavez was a member of that gang because Chavez had the word "Verdugo" tattooed on his neck.

Ramos testified he "got kind of scared" as he and Chavez began wrestling over the rifle. Concerned that Chavez would take the rifle and use it against him, and because Ramos knew Chavez was a gang member, Ramos fired the rifle at Chavez. Ramos did not

6

remember firing a second bullet at Chavez. Ramos testified he then saw Hale, about 18 to 20 feet away, reach into his pocket and pull out "something shiny." At about the same time Ramos saw someone wearing a white or grey shirt standing by the driveway shoot at him. Ramos in response continued shooting his rifle in Hale's direction. Scared, Ramos testified he ran away, went near a fence by a house that appeared to be abandoned and "ditched the rifle." He then called his mother.

Ramos testified he and Avila got into a fight about a week before Ramos's trial started. According to Ramos, Avila head-butted him. Ramos denied slicing Avila with a razor blade, although admitted he asked Avila before the head-butting incident what Avila intended to "say when he takes the stand." Ramos also admitted he was responsible for the gang graffiti in his jail cell.

On cross-examination, Ramos testified he got a North Side Colton gang tattoo in 2009 while in prison. Ramos said "pretty much" anybody can get a gang tattoo in prison, and that it is not necessary to "earn" or "put in work" for the gang in order to obtain one.

Ramos denied that Avila tackled him after he shot Chavez and Hale. Ramos also denied that Ruiz was present at the time of the shooting, denied Ruiz fired the gun after Ramos shot Chavez and denied speaking to Ruiz that evening as Avila claimed in his testimony. Ramos instead stated Ruiz left the group before Ramos went home to retrieve his rifle. According to Ramos, other than himself, the only people present at the time of the shooting was Avila, Chavez, Hale, Moya and the person in the driveway (not Ruiz) that started shooting at him.

7

Dr. Ronald Markmam testified as a forensic psychiatrist that use of marijuana and alcohol can facilitate impulsive, thoughtless behaviors in a stressful situation. He also testified the use of such intoxicants can produce paranoia, so that events are misinterpreted. Finally, he testified that regardless of whether a person is under the influence, when a person thinks his or her life is being threatened, that person typically will either run from the situation or react excessively and face and respond to it.

DISCUSSION

I

*Admission of the Letter Ramos Wrote His Family*

A. *Additional Background*

Police took Ramos to the station following his arrest. Colton police detective Henry Dominguez interviewed Ramos in the early morning hour following the shooting. The interview was recorded and was reviewed by this court. During the interview Ramos confessed to the shootings. He moved pretrial to suppress the confession, claiming his statements to police violated his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) because the tape of his interview did not include the required *Miranda* warning and he allegedly did not understand the warning as a result of his mental faculties and/or impairment from alcohol and/or drugs that he had consumed near the time of the killings.

The record shows Detective Dominguez testified pretrial that he used Colton Police Department Form 3603 and read Ramos his *Miranda* rights before he interviewed Ramos, and that Ramos understood those rights and agreed to speak with him. Detective Dominguez testified the station at that time had an old recording system, and another

8

officer sitting in a separate room did not start the recording until after Ramos had been read his *Miranda* rights. It appears from the record the defense submitted on this issue and the trial court found Ramos was properly given the *Miranda* warning, and that Ramos voluntarily agreed to speak with Detective Dominguez.

The court nonetheless took up the issue of the voluntariness of the statements made by Ramos during the interview. The court noted it had watched the video interview and it appeared "that the police are saying that they have the defendant's grandmother and mother in custody. There are repeated references to that fact." The defense next read a portion of the transcript from the interview that summarized the detective's approach during the interview:

" 'So we [i.e., the police] are arresting them [i.e., the grandmother and mother] right now, unless we can figure out exactly what's going on.' That's just the first context where this is, I would say, a direct threat to arrest a loved one. It's more aggressive and specific than the way I think the Court illustrated it on the record. I just wanted to say that. Submit it.

"The Court: I think it varies at different points in the interview, an unequivocal threat to say we are arresting them. It appears from what I can glean from the interview, that the defendant has admitted to calling his mother and grandmother after the incident, and that they are, at least on the face of it, would appear to be suspects involved as, perhaps, accessories. [¶] . . . [¶]

9

"[The prosecutor:] I think we have to look at the totality of the interview. I think we have to look at the fact that the officer is being truthful to the defendant, as to the truthful, legal consequences of what happened. You have mom or grandmom picking him up, could legally be accessories after the fact. This officer had to have a way to determine who was telling the truth. He told Mr. Ramos that he talked to grandma first and then Rudy next to determine the truth of the matter here. And if you look at the length of the interview, it wasn't lengthy. They gave him water. If you look at the interview, [the officer] was respectful, was polite. There was no yelling, no outward threats, no outward violence towards Mr. Ramos. And I think what we really have to focus on is, at the end, everything [the officer] told Mr. Ramos was the truth, what could legally happen—what the legal, truthful consequence of what can occur."

The record shows the court continued the hearing to read some additional authorities provided by the parties. After the continuance, the court noted the issue of coercion was "close enough" that the court wanted to give the issue more thought before making a ruling. The court noted the officer conducting the interview told Ramos it looked as if his mother and grandmother were guilty and that if they were not, "you [i.e., Ramos] might want to tell me about it. Nothing inherently coercive about just stating the lay of the land as it sits." The court also noted it was not necessarily coercive for an officer to say, " 'Hey, you got some people into this. You know, we all know this to be the case. So if they are not involved in this, this might be the time to tell me that.' That seems like a fairly unremarkable law enforcement technique that we see all the time."

The court subsequently ruled as follows to exclude a portion of the interview on the grounds it was coercive:

"I recognize it's a fact-specific inquiry, and I recognize the nature of the question presented. Specifically, the question is, whether or not the defendant's admission of guilt is coerced? I will say that in the Court's mind, there's no question that much of the statements that the defendant makes are not coerced. The concern the Court has had is that the . . . defendant is repeatedly told that his mother and grandmother are going to be arrested unless the defendant says what happens . . . .

"And I will say there's certain statements that give the Court pause more than others. For example, [the] question by [the officer], 'You got to help your family.' The response, 'So what do I got to say for them to leave?' And the officer responds, basically, well, talk to me; and the defendant says, at that point, he did it. Now the question of whether or not subjectively, was the defendant, in fact, influenced by the threat to arrest his grandmother and mother? In the Court's view, the answer is that seems to be the case, in that, later in the interview, the defendant says something to the effect, I told you what you wanted, now, let them go. Now, it's not the clearest case in the world, I will say, because I will note that the defendant also says—expresses some skepticism about whether or not the police had his mother and grandmother in custody. That is something on the other side of the scale.

"So it's not a clear case, and it's one that—one that I have struggled with. But based on my review of the relevant authority, I am going to exclude the . . . statement — exclude at least part of the statement on the grounds that it was not voluntary. I will say

11

one thing for the record, and I think it is important, and I alluded to this at one point earlier in the trial, the transcript reads very different from the actual video recording of the interview. The interview does appear to be cordial. It . . . appears that the officers were, you know, in a sense, polite. They were not what I would call particularly aggressive. And I say 'officers' because there's another officer that briefly appears in the interview, as well. So I did not see anything, frankly, that I would call out. I didn't see anything that looked like outrageous law enforcement conduct, and I think that is important to emphasize.

"It appears that, in fact, the police did have reason to believe that the mother and grandmother were involved. I don't think there's any dispute about that. But in the Court's view, the truth of the representations, namely that the . . . defendant's mother and grandmother would likely be arrested based on the state of the evidence that the police had, does not mitigate its potential, coercive nature. Especially in light of the fact that there was, you know, a repeated return to that subject. So . . . that is the Court's ruling on that. It remains to [be] determined precisely which part of the interview would be excluded. I understand the People would like to use parts of it, and certainly I . . . don't think that the statement was coerced in it's entirely or involuntary. I use the term coerced, but really am using that more in a legal sense than anything.

"I don't think that applies to the entire statement. I guess what I would ask is, if there are certain parts of the statement that the People wish to use, that we address those. I would say tentatively, I think most of the statement would be admissible. The exact contours of the admissibility will have to be determined as the trial progresses."

12

Pertinent to the instant issue, the court next found the letter written by Ramos shortly after he confessed was *not* the product of police coercion:

"I [i.e., the court] agree with the People on this . . . . I think the officer had indicated by this point there would be no consequences to his mother and grandmother. He offered to let the defendant write a letter, did not insist that he do so. And, 'So if you want to write them a letter, or whatever you want to tell them'—this is reading from the officer's statement—'I don't care what you want to say, man, that's between you guys. It's a letter for your grandmom or you mom, whoever wants to get it. If you want to pass on a letter to your girlfriend or whatever or anybody else, I will give them that, too, and they can pass it on.'

"So this appears to be entirely—an entire voluntary statement—entirely voluntary choice by the defendant to write a letter. It's addressed to his grandmother and mother and looks like Ryan and Jimmy. I don't know who that is. But so I'm going to allow the People to admit that over the defense's objection."

Later during trial, the court revisited the issue of the letter, noting it had read recent California Supreme Court authority that emphasized that coercive behavior "only requires that a statement be excluded if that statement is . . . [c]ausally related to the statement in question. [¶] My view of the interview is that the statement that or—I'm sorry—behavior that I found coercive, and I will say it's still a very close question to me. And I will also say that some of the authority I read in connection with this issue made me wonder that actually that behavior was as coercive as I found it to be. But [in] any event, I'm not going to revisit that issue. But I am also going to find that the coercive behavior here, which

13

was specifically the threat to arrest the defendant's grandmother and mother as being involved in the case was not causally related to Mr. Ramos's decision to write a letter. By the time he wrote that letter, the threat to arrest the defendant's family had lapsed. And I just see no meaningful nexus between that behavior and Mr. Ramos's decision to write the letter.

"So over defense's objection, I am going to find that letter is not the product of the officer's behavior. And I am going to allow the People to introduce it."

In response to the defense's contention that Ramos's mother and grandmother were still in custody when Ramos wrote the letter, the court found:

"My view of the video tape of the interview leaves me with a distinct impression that the officers had indicated, if not expressly, by every implication the way that the conversation happened, that the relatives would be released. I don't know, that's the impression that plainly leaves me with. That seems to be the impression that the defendant had. I grant you that I'm making inferences about, you know, about the defendant's mental state there. But that's the impression that it leaves me with."

Detective Dominguez—who conducted the interview in October 2006—read to the jury the contents of the letter written by Ramos:

"Grandma, Mom and Michelle, Mom and Ryan and Jimmy. I love you guys. I'm sorry for all this. I don't want you to worry. Tell Ryan to stay out [of] Colton or to have Richard watch out for him and Little Manuel. I fucked up. But tell Ryan to keep his head high. It was Jackie's cousins that I shot, so watch out. Ryan listen to Mom [and] [stay] the fuck away from lame with .38 on our block. Fuck that motherfucker. Ryan I will

14

write all the time—you have—I will write you all the time. You have out there I have in here. Let's do this. Also bum the—I can't some SPMCD for me. Mom . . . Linda, I love you and I'm sorry I turned out worse than your boy. To Jimmy thanks for the job. I should have listened to you. Also tell Randy at work to . . . fuck off. To my mom, I'm sorry I left, but go to the toy store for Ryan please. I didn't want to hurt you, but thanks for trying. To Richard, watch my brother fool and put it down. . . .To Manuel, man up fool and watch my brother and hook me up with so [sic] bitches fool.

"Take care you were [the] best family I could ever have. Tell Jake and Carisse I love them, Dominic too. Bye, also Auntie and Rayn from Boogie. Love you forever. Ryan you're the best friend homie brother of all time. Put it down. Be careful."

Ramos contends the letter also should have been excluded as a result of the coerced confession. Specifically, he contends that only a few minutes passed between the conclusion of his interview where he confessed to being the shooter and when police provided him with paper and a pen to write a letter if he desired. He further contends at the time he wrote the letter he was merely 18 years old, attended school only through the 11th grade and wrote the letter at the suggestion of the detective that coerced his confession, which he contends played into the emotions created by such tactics.

B. *Supplemental Briefing regarding Ramos's Confession He Was the Shooter*

We note the People initially did *not* challenge on appeal the ruling to suppress Ramos's videotaped statements confessing to the killings as a result of the alleged coercive behavior of Detective Dominguez. However, on our own motion we sought and received supplemental briefing from the parties regarding (i) whether Ramos's excluded confession

15

was in fact involuntary and (ii) the standard we should apply in reviewing that determination.[3]

Ramos in his supplemental brief relies on section 1252 and contends this court lacks the power to address the voluntariness of his videotaped confession, which was excluded by the trial court, because the People did not raise the propriety of the trial court's ruling in this appeal. We disagree with this contention for two reasons.

First, the plain language of section 1252 does *not* support Ramos's contention.[4] Second and more importantly, however, although the People did not directly raise the issue whether the trial court correctly excluded Ramos's statements in the videotaped interview that he shot the victims, Ramos in fact has put that issue front and center before this court when he contends the letter he wrote to his family shortly after he confessed to the shootings was *also* the product of his alleged involuntary confession resulting from undue police coercion, and thus *also* should have been excluded by the trial court. We thus turn to that issue next.

---

[3]    In connection with this supplemental briefing, we granted the People's unopposed request to augment the record to include the transcript of Ramos's videotaped interview with Detective Dominguez at the police station on the morning after the shooting.

[4]    Section 1252 provides: "On an appeal in a criminal case, no continuance shall be granted upon stipulation of counsel, and no continuance shall be granted for any longer period than the ends of justice shall require. On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General."

1. <u>Governing Law</u>

It is axiomatic that " '[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.' [Citations.] As with *Miranda* waivers, the People bear the burden of establishing by a preponderance of the evidence the voluntariness of a confession. [Citations.]

"In reviewing the trial court's denial of a suppression motion on . . . involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551 (*Duff*).)

" ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' [Citation.] In assessing whether statements were the product of free will or coercion, we consider the totality of the circumstances, including ' " 'the crucial element of police coercion,' " ' the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental health." (*Duff*, *supra*, 58 Cal.4th at p. 555.)

17

2. Analysis

The record shows at the time the police made the allegedly coercive statements they reasonably could believe that Ramos's grandmother and mother were involved in some manner in the shooting and/or in Ramos's attempt to flee the scene, as also noted by the trial court, including at a minimum as accessories after the fact.

Indeed, the record shows Detective Dominguez 's statements to Ramos that police were going to arrest his grandmother and mother were not based on idle threats, but rather on the fact that his grandmother and mother arrived at the crime scene to pick up Ramos at the *same* time police arrived and saw an individual, later identified as Ramos, matching the description of one of the suspects given by dispatch; that police first spotted Ramos near a fence where, shortly thereafter, police found the rifle used in the shooting; that as the minivan approached, Ramos at gunpoint refused the repeated commands of a uniformed police officer to stop; that despite such commands, the sliding door of the minivan opened and Ramos got inside; that the officer at gun point approached the minivan, continued to yell at Ramos to stop and also yelled at the driver of the minivan, who police later determined was his mother; that the officer at gun point stood in front of the minivan, which the officer said was beginning to move slowly despite being told to stop; that if the officer had not blocked the path of the minivan, according to the officer it would have left the scene with Ramos inside; that Ramos finally followed the commands of police, got out of the minivan and police arrested him; that Ramos's grandmother and mother also exited the minivan at gun point; and that police took all of them to the police station for questioning.

18

We independently conclude from these facts that during the interview when Detective Dominguez told Ramos they were going to keep his grandmother and mother in custody and perhaps even arrest them as a result of their involvement in the shootings unless Ramos told them the truth regarding his and their involvement, if any, such statements did not make Ramos's subsequent confession he was the shooter involuntary. (See *Duff*, *supra*, 58 Cal.4th at p. 551.) As such, we disagree with Ramos that cases such as *People v. Trout* (1960) 54 Cal.2d 576 (*Trout*), overruled on another ground as stated in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17, require that his confession be suppressed on the ground it was involuntary.

Briefly in *Trout*, the police went to the defendant's home at about 10 or 11 p.m. and entered the house through an unlocked door with drawn guns after they suspected the defendant had been involved in an armed robbery and kidnapping. The defendant and his wife were watching television while their three young children slept in their bedrooms. The police then took the defendant and his wife to the police station. The defendant's wife gave police a written statement that on the night of the crimes, she was at a church Christmas party and did not return home until about 9:00 or 9:30 p.m. The police interviewed the defendant four times the following day, including twice in the presence of his wife. During the interrogation the police told the defendant's wife to speak with the defendant about the crimes. Finally, at about 3:30 p.m., after not sleeping and not being given breakfast, the defendant confessed to the crimes. Immediately following the confession, the police released the defendant's wife. (*Trout*, *supra*, 54 Cal.2d at pp. 579-580.)

19

Our high court in *Trout* concluded the defendant's wife was placed and held in custody for the purpose of securing a confession from the defendant "although they [i.e., the police] had no grounds for her arrest." (*Trout*, *supra*, 54 Cal.2d at p. 584.) Moreover, our high court dismissed the contentions of the People that the police had grounds to believe the defendant's wife was a suspect in the crimes, noting that if the police actually had considered her a suspect they would not have allowed her in the interview room when police questioned her defendant husband or asked her to speak alone with her husband at various points in time during the interrogation. (*Id.* at pp. 584-585.) Thus, because at a minimum police implied the defendant's wife would be released from custody if the defendant confessed to the crimes that police had no grounds to believe the wife committed, the *Trout* court concluded the confession of the defendant "resulted from improper pressure by the police and should not have been received in evidence." (*Id.* at p. 585.)

In contrast to the facts of *Trout* where the police detained a person (i.e., the defendant's wife) despite having no grounds to believe that person was involved in or a suspect in the crimes, here the record shows the police, when interviewing Ramos, did have reasonable grounds to believe Ramos's grandmother and mother were involved in some capacity in the shootings and/or in his escape. Indeed, the record shows the Ramos interview began at about 4:35 a.m. the morning after the shooting—when the police investigation undoubtedly was in its infancy—just a few hours after the shooting the night before. Moreover, as noted *ante*, Ramos's grandmother and mother arrived near the crime scene just minutes after the shooting to pick up Ramos, who was a suspect in the shooting

20

and who refused the repeated commands of the police to stop as he attempted to flee the scene in the minivan driven by his mother.

Although we agree with the trial court that the issue is "close," we nonetheless independently conclude on this record that the statements made by Detective Dominguez during Ramos's interview regarding detaining and perhaps even arresting his grandmother and mother unless he told them the truth about his and their involvement in the shooting, if any, were not unduly coercive. (See *People v. Montano* (1960) 184 Cal.App.2d 199, 210 [observing that the " 'fact, alone, that the principal motive for a confession is that it will probably result in the exoneration of another person who is suspected of complicity in the offense does not render the confession involuntary' "]; cf. *People v. Rand* (1962) 202 Cal.App.2d 668, 670, 674 [reversing the conviction of the defendant based on coercive statements by a police officer who told the defendant if the defendant did not know who owned 35 marijuana cigarettes police found in his apartment after a warrantless search, the officer would have to arrest the defendant's wife and have their children "lock[ed] up" in juvenile hall]; *People v. Mellus* (1933) 134 Cal.App. 219, 223-224 [reversing the conviction of the defendant after he confessed to stealing chickens because the police officer told the defendant if he did not "come clean" about stealing the chickens and "exonerate[ing]" his mother they were going to hold both of them because they "naturally presume[d]" she was with the defendant when he took the chickens].)

Based on the totality of the circumstances—including as noted by the trial court that Detective Dominguez treated Ramos in a respectful and professional manner throughout the relatively short one hour and 10 minute interview, that Detective

21

Dominguez merely told Ramos what was happening and what could happen regarding his grandmother and mother given the circumstances *then* known to the detective in what was the very beginning of the police investigation—we conclude Ramos's statements to the police that he was the shooter were not coerced.

Moreover, even if the detective's statements to Ramos during the interview threatening to detain and even arrest his grandmother and mother could be deemed unduly coercive, we still would independently conclude that Ramos' confession should not have been excluded. The record shows that *after* Ramos confessed to being the shooter, he told the detective he did *not* believe the police had actually detained his grandmother and mother. As such, we conclude the requirement of a causal nexus or connection between a defendant's statement confessing to a crime and the alleged coercive police conduct is absent in the instant case. (See *People v. Williams* (2010) 49 Cal.4th 405, 436-437 [noting a "confession is not involuntary unless the coercive police conduct and the defendant's statement are causally related"].)

C. *The Letter Was Independently Admissible Irrespective of Ramos's Confession*

Assuming arguendo Ramos's confession to the detective was the product of unlawful police coercion and thus properly excluded from evidence, we nonetheless would still independently conclude the trial court did not err when it ruled to admit into evidence the letter he wrote to his family. We turn now to that issue.

1. Guiding Principles

"Previous decisions have acknowledged that where—as a result of improper police conduct—an accused confesses, and subsequently makes another confession, it may be

22

presumed the subsequent confession is the product of the first because of the psychological or practical disadvantages of having ' "let the cat out of the bag by confessing." ' [Citations.] Notwithstanding this presumption, 'no court has ever "gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." ' [Citations.] Thus, the foregoing presumption is rebuttable, with the prosecution bearing the burden of establishing a break in the causative chain between the first confession and the subsequent confession. [Citations.]

"A subsequent confession is not the tainted product of the first merely because, 'but for' the improper police conduct, the subsequent confession would not have been obtained. [Citation.] As the United States Supreme Court has explained: '[N]ot . . . all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' [Citations.] The degree of attenuation that suffices to dissipate the taint 'requires at least an intervening independent act by the defendant or a third party' to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality." (*People v. McWhorter* (2009) 47 Cal.4th 318, 359-360 (*McWhorter*).)

23

2. <u>Analysis</u>

The record shows that at the conclusion of the interview and *before* the police provided Ramos with a pen and paper, Detective Dominguez expressly told Ramos they were going to release his grandmother and mother and told him they were going to communicate that fact to them. The record also shows about five minutes later, Detective Dominguez returned and told Ramos that police would be conducting a search of his residence. When Ramos expressed concern about the search, Detective Dominguez told Ramos the search would be conducted in an orderly manner and it would not be a "raid" by police.

The record further shows Detective Dominguez then told Ramos he had unsuccessfully attempted to bring his mother and grandmother into the interview room to speak to Ramos. The detective, however, gave Ramos a pen and paper and told Ramos *if* he wanted to, he could write his grandmother and/or his mother, or even his girlfriend if he had one, and that the detective would make sure any such letters would be delivered. The detective also told Ramos it was up to him whether to write anything or anybody.

Assuming for present purposes only the police engaged in coercive behavior that rendered Ramos's confession during the interview involuntary, we nonetheless independently conclude such alleged coercive behavior ended when Detective Dominguez told Ramos at the conclusion of the interview his grandmother and mother would be released. As such, we further independently conclude that the removal of the threat that they could be detained and even arrested broke the causal connection between the

24

allegedly improper confession by Ramos during the police interview and any alleged confession he subsequently made in the letter. (See *McWhorter*, *supra*, 47 Cal.4th at p. 360.)

D. *Harmless Error*

Perhaps equally if not more importantly, we also conclude any error by the court in admitting the letter was harmless under any standard. Indeed, the record shows Ramos testified he and Chavez wrestled over the rifle after Ramos pointed it at Avila merely in an attempt to show off to Avila. Accepting Ramos's testimony on this issue, Ramos said he became scared after Chavez made a statement that Ramos interpreted as a gang threat. Ramos in response shot Chavez because he believed Chavez would take the loaded rifle and use it against him. Ramos testified he also shot Hale after he saw Hale allegedly pull out something shiny.

The record also shows that when questioned about the letter, Ramos stated its purpose was to tell his family he "love[d] them" and was "sorry for putting them in this situation." He testified he did not finish the letter and wrote it in a rush.

Moreover, during closing argument the defense noted there were only three witnesses to the shooting: Avila, who the defense noted had recanted his testimony and had become the People's "star witness"; Moya, who the defense noted claimed in testimony that she did not see what happened and in any event lacked credibility, as also stated by the prosecutor; *and* Ramos. The defense argued the letter written by Ramos was about love and to say "I'm [i.e., Ramos] sorry, mom. I'm sorry, mother, that I'm in this situation and I got you in the situation."

25

Important to the issue of harmless error, the defense also argued the letter was *not* a confession: "If you [i.e., the jury] can tell me that's a confession [i.e., the letter], then find him [i.e., Ramos] guilty. But there is no way because I even asked the detective that and they said, no. That letter is someone who has been charged with two counts of murder" who was saying "I'm sorry. I'm sorry I got you arrested, Mom. I'm sorry I hurt Grandma. And I'm sorry that I am involved in a shooting and bad things have happened."

In addition, during closing the defense argued as follows that Ramos's testimony was more credible than Avila's:

"And by the way, about Mr. Ramos, think about this. What sounds more—this [is] what it all comes down to. I'm going to just say it right now. Here's the issue. What do you think sounds more believable? That Mr. Ramos woke up one day and says, I'm going to be an executioner because I'm going to be down on the block and now I want to be an active gang member, so I'm going to kill my neighbor's relatives. Or something happened outside that triggered something ugly?

"That's exactly what Mr. Avila said and Mr. Ramos. The difference is we never knew it, I knew it through Mr. Ramos. I'm his lawyer. But we never knew that because Mr. Avila's original statement never mentioned the confrontation with Mr. Chavez grabbing the rifle. If we would have known that in the beginning, it changes the case, in my opinion. Because there is no way, based on the fact pattern, there is any intent to kill Mr. Chavez. So what sounds more believable though. Mr. Ramos being young and stupid and foolish and trying to show off a rifle that has recently been acquired. And the two

victims who happen to be also under speed and highly intoxicated, misinterpreting that. That makes sense to me. I hope it makes sense to you."

Here, we conclude that even if the court erred in admitting the letter in which Ramos acknowledged his involvement in the shooting, that error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) We reach this conclusion because the record shows Ramos did *not* dispute at trial that he shot and killed Chavez and Hale. In addition, because the defense portrayed the letter as communicating Ramos's sentiments to his family of "I'm sorry" and "I love you" and specifically argued it was *not* a confession, we further conclude the letter in any event was not relevant to the overarching issue at trial—as reflected *ante* both in Ramos's own testimony and in the closing argument of defense counsel—whether Ramos was justified in the killings because among other reasons he felt threatened as a result of Chavez's and/or Hale's affiliation with Verdugo Flats, a rival gang of North Side Colton.

Finally, we also conclude any error in admitting the letter was harmless under *Chapman* for the separate reason because, even absent the letter, the evidence in support of his conviction was strong, including the fact Ramos took the witness stand and admitted he was the shooter but claimed he shot the victims in self-defense (a claim that the jury clearly rejected). In addition, after Ramos shot the two victims he fled the scene and hid the rifle near a fence. (See Evid. Code, § 1127c [noting the "flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence," and noting the "weight

27

to which such circumstance is entitled is a matter for the jury to determine."]; see also *People v. Elliott* (2012) 53 Cal.4th 535, 584.) And several .30-30 rounds were later found in Ramos's home. In light of the overwhelming evidence that Ramos was the shooter, we conclude any error in admitting the letter when he acknowledged shooting "Jackie's cousin" was harmless beyond a reasonable doubt.

## II

### *Jury Instructions*

Ramos next contends the court prejudicially erred in giving CALCRIM No. 1403 as modified. Specifically, Ramos contends the instruction as given prevented the jury from considering gang evidence as it related to his fear when he fired the rifle, which he contends went to his defense of self-defense.

The court instructed the jury as follows with modified CALCRIM No. 1403:

"You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant had a motive to commit the crimes charged or whether any of the witnesses had a motive to testify in a particular way.

"You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.

28

"You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."[5]

First, because the instruction given did not omit or withdraw an element from the jury's determination, we conclude Ramos had the burden to request an additional or clarifying instruction if he believed that the instruction was incomplete or needed elaboration. (See *People v. Maury* (2003) 30 Cal.4th 342, 426; see also *People v. Cox* (1991) 53 Cal.3d 618, 669, disapproved on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) However, the record shows Ramos did not seek an additional or clarifying instruction with respect to modified CALCRIM No. 1403.[6]

---

[5] Unmodified CALCRIM No. 1403 provides: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] [The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related (crime[s]/ [and] enhancement[s]/ [and] special circumstance allegations) charged(;/.)] [¶] [OR] [¶] [The defendant had a motive to commit the crime[s] charged(;/.)][¶] [OR] [¶] [The defendant actually believed in the need to defend (himself/herself)(;/.)] [¶] [OR] [The defendant acted in the heat of passion(;/.)] [¶] [OR] [¶] [ <insert other reason court admitted gang evidence>.] [¶] [You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.] [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that (he/she) has a disposition to commit crime."

[6] The record shows the defense objected to modified CALCRIM No. 1403 ostensibly during an unreported chambers conference between counsel and the court. The record thus does not show the reason or reasons the defense objected to CALCRIM No. 1403, but it is clear from the record that the defense did not request an additional or clarifying instruction in connection with CALCRIM No. 1403.

Second, although in giving modified CALCRIM No. 1403 the court excluded from that instruction the language that gang evidence could be used to show Ramos "actually believed in the need to defend [himself]" or "acted in the heat of passion" (see CALCRIM No. 1403, fn. 5, *ante*), we note the court did properly instruct the jury on the defenses of self-defense (CALCRIM No. 505), imperfect self-defense (CALCRIM No. 571) and provocation (CALCRIM No. 522).

CALCRIM No. 505 provided in part that in determining whether a defendant acted in self-defense the jury had to determine among other things whether the defendant "reasonably believed that he was in imminent danger of being killed or suffering great bodily injury." CALCRIM No. 505 further provided that when deciding "whether the defendant's beliefs were reasonable," the jury was to "consider *all the circumstances* as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." (Italics added.)

Similarly, in CALCRIM No. 571 pertaining to imperfect self-defense, the jury was instructed that in evaluating whether the defendant's beliefs he was in imminent danger of being killed or suffering great bodily injury, it should "consider *all the circumstances* as they were known and appeared to the defendant." (Italics added.)

Here, we independently conclude the court did not err and if there was error, it was harmless when it instructed the jury using modified CALCRIM No. 1403, in light of the other instructions the jury received which required the jury to consider *all the circumstances* as they were known to and/or appeared to defendant Ramos in connection with self-defense and imperfect self-defense. It is axiomatic that "the correctness of jury

30

instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538-539, disapproved on other grounds as stated in *People v. Reyes* (1998) 19 Cal.4th 743, 753-754.) "We assume that the jurors are ' " 'intelligent persons and capable of understanding *and correlating* all jury instructions . . . given.' " ' " (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.) When a criminal defendant alleges instructional error, our standard of review is de novo. (See *People v. Burgener*, at pp. 538-540, disapproved on other grounds as stated in *People v. Reyes*, at p. 754.)

Moreover, we note that the defense in closing repeatedly referenced the fact that Chavez and Hale were known gang members from a rival gang and thus were the "type of people that carry weapons." The defense argued the gang evidence was crucial in this case because it went to Ramos's state of mind when he and Chavez (allegedly) wrestled over the rifle and when Ramos subsequently shot Hale, after Ramos (allegedly) saw Hale pull out something shiny that Ramos ostensibly believed was a weapon. The defense also argued Ramos's state of mind was influenced by the fact he lived in an area "infested" with gangs and some of his relatives were gang members.

We thus conclude the defense's closing argument further supports our determination that when viewed in context, there was no instructional error in connection with modified CALCRIM No. 1403, and even if such error did exist, it was harmless because it is not reasonably likely that a reasonable jury ignored the gang evidence when considering whether Ramos acted in self-defense or imperfect self-defense in connection

31

with the shooting.  (See *People v. Cain* (1995) 10 Cal.4th 1, 37 [noting it was not reasonably likely a jury was misled by a "surplus implied malice instruction" based in part on the prosecutor's closing argument that special circumstances required intent to kill;] see also *People v. Kelly* (1992) 1 Cal.4th 495, 526  [noting closing arguments can be considered in evaluating potential prejudice from erroneous jury instruction]; *People v. Moore* (1988) 47 Cal.3d 63, 87-89 [noting closing arguments can be considered in determining adequacy of instruction on issue of corroboration required for accomplice testimony].)[7]

## III

### *Pitchess Motion*

Ramos requests—and the People agree—that we conduct an independent review of the personnel records of Detective Dominguez to determine whether the trial court erred when it found no such records were discoverable.  Ramos and the People do not agree, however, regarding the scope of that review.

On the one hand, Ramos contends the trial court erred when it limited its review of these records to complaints of falsifying prior statements of witnesses.  He instead contends the court should have reviewed the records for "all prior acts of dishonesty,"  The People, on the other hand, disagree and contend the court properly limited its review to any reports of falsifying prior statements from witnesses.

---

[7]    Defendant also contends the cumulative error doctrine requires reversal.  Because we have found no errors, that doctrine is inapplicable.  (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1344.)  In addition, assuming arguendo the trial court erred, as we noted none were prejudicial and as such, there is no reasonable probability that a result more favorable to Ramos would have been obtained absent any such alleged error.

A defendant is entitled to discovery of a police officer's confidential personnel records if those files contain information that is potentially relevant to the defense. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538; see also Evid.Code, §§ 1043-1045.) The discovery procedure has two steps: a defendant first files a motion seeking such records along with affidavits "showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation." (Evid. Code, § 1043, subd. (b)(3).) Second, if good cause is shown, the court reviews the records in camera and discloses only those records and information that are relevant and not subject to exclusion from disclosure. (Evid. Code, § 1045, subds. (a) & (b); see also *People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316.) The threshold for having the trial court conduct an in camera review is relatively low. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83-84.)

A trial court is granted broad discretion when ruling on a motion to discover police officer records (*People v. Memro* (1995) 11 Cal.4th 786, 832) and we review that ruling for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039).

Here, as noted the trial court granted in part Ramos's motion and conducted an in camera review of the materials. After examining the custodian of records and reviewing the applicable records, the court found no discoverable material and ordered the transcript sealed.

33

As requested, we have reviewed the sealed transcript and conclude the trial court properly conducted a *Pitchess* document review hearing. However, because the personnel records produced during the in camera hearing were not included as part of the record on appeal, on our own motion we sought those records and reviewed them not only with respect to complaints of falsifying prior statements of witnesses but for "all acts of dishonesty."

Based on our independent review of the sealed augmented records reviewed in camera by the trial court, we conclude that the court properly exercised its discretion in determining that the documents produced complied with the scope of the *Pitchess* motion and that no additional documents or information should be disclosed to the defense.

DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.